RACHEL ANDERSON, et al.,      )
                                 )
     Plaintiffs,         )
                                 )      No. 20 C 4648
     v.                    )
                                 )      Judge Jorge L. Alonso
TWIN RESTAURANT        )
OAKBROOK, LLC, et al,     )
                                 )
     Defendants.       )

## MEMORANDUM OPINION AND ORDER

Plaintiff Sarah Blaylock ("Blaylock") and 31 other plaintiffs filed against defendant Twin Restaurant Oakbrook, LLC and twelve other defendants a second amended complaint asserting claims of employment discrimination under several statutes. Before the Court are two motions to dismiss: one filed by defendant Front Burner Restaurants, LP ("Front Burner") and one filed by the remaining defendants. For the reasons set forth below, the Court denies the motions to dismiss.

## I.    BACKGROUND

The following facts are from plaintiffs' second amended complaint, and the Court takes them as true. In addition to Blaylock, the plaintiffs are Rachel Anderson ("Anderson"), Brianne Bidochka ("Bidochka"), Kenneth Biggers ("Biggers"), Madison Clements ("Clements"), Kamari Evans ("Evans"), Johnae Farr ("Farr"), Stephanie Faynshteyn ("Faynshteyn"), Hayley Frank ("Frank"), Samantha Fuller ("Fuller"), Lizbeth Hurtado ("Hurtado"), Jessica Litavsky ("Litavsky"), Brittany Marrotta ("Marrotta"), Andrea Mascorro ("Mascorro"), Chrystal McBride ("McBride"), Jessica Mercer ("Mercer"), Alexandra Miranda ("Miranda"), Tashia Moore ("Moore"), Bobbie Peck ("Peck"), Jennifer Quinn ("Quinn"), Kialah Reed ("Reed"), Darryl

Rodriguez ("Rodriguez"), Destiny Rucker ("Rucker"), Sonia Santellanes ("Santellanes"), Andonia Subsits ("Subsits"), Autumn Sullivan ("Sullivan"), Caitlyn Temesvary ("Temesvary"), Danielle Uphoff ("Uphoff"), Karena Villegas ("Villegas"), Bailey Ward ("Ward"), Russell Williamson ("Williamson") and Susan Winfield ("Winfield"). Plaintiffs sometimes refer to defendants collectively as Twin Peaks.

When Twin Peaks was founded in 2005, one of the founders, Randy DeWitt, commented that "Hooters just wasn't racy enough." (2nd. Am. Complt. ¶ 4). According to the complaint, the CEO, Joe Hummel, has said, "Twin Peaks is different [from] other 'breastaurants' because, 'Everybody has done bits and pieces of it, but no one has done the whole program,'" which includes, in addition to made-from-scratch food and a mountain-lodge-like decor, beautiful "Twin Peaks Girls." (2nd. Am. Complt. ¶ 11-12).

To attract female employees, Twin Peaks requires no experience, offers flexible scheduling and does not require servers to perform side work. As part of the application process, Twin Peaks managers require applicants to put on the Twin Peaks Girl uniform, which consists of a plaid shirt and short shorts. The manager takes pictures of each applicant from the front, side and back and sends the photos to "corporate 'for approval.'" (2nd. Am. Complt. ¶ 17(b)). If corporate approves, the woman is hired immediately and provided a plaid shirt and money belt. The woman is required to purchase her own short shorts, rhinestone belt and winter boots.

That uniform, however, was not always what the women were required to wear. Twin Peaks restaurants regularly hosted week-long costume parties, during which the female employees, unlike the men, were required to wear lingerie, which they were required to purchase themselves. For example, during Breast Cancer Awareness month, the women, unlike the men, were required to purchase (without reimbursement) pink lingerie that exposed their breasts. The

women were not allowed to wear the same lingerie more than once, and their alternative to wearing lingerie was not to work for the week.

Plaintiffs allege that defendants created an environment that was "ripe for, and in fact did result in, rampant sexual harassment and a hostile work environment in which men—ranging from the managers to the kitchen staff to the customers—felt free to touch them and say things to them without consequence." (2nd. Am. Complt. ¶ 35). At the beginning of each shift, for example, the women were ordered to line up for a group photo, which was sent to corporate.

Plaintiffs were graded on their appearance, which affected their ability to earn tips. At the beginning of each shift, a manager "would walk the floor with a grading sheet, assigning a 'tone grade' to the Girls' bodies, giving a 1-10 score on the Girls' back, arms, stomach and legs, for a maximum 40 points." (2nd. Am. Complt. ¶ 20(d)). The tone scores were used to calculate each woman's ranking, and those with the higher rankings got first pick of the most lucrative sections in which to serve. During grading, managers sometimes grabbed, poked, pinched and pulled on the women's exposed body parts and stated, "This is why you don't have a higher grade," and "this is why you'll never work behind the bar." (2nd. Am. Complt. ¶ 27(e)). Sometimes the lowest-ranking women in the least-lucrative sections received no tips. Plaintiffs allege that women could improve their ranking by sleeping with a manager.

Gaining weight was not good for the female servers' careers. To shame women, managers used a tactic the plaintiffs refer to as the "fat talk," during which a manager showed a woman the photos from the day she was hired and told her she no longer looks like that. Women were sometimes placed on probation for being fat and threatened with employment termination if they did not lose weight within 30-60 days. Plaintiff Hurtado, for example, was told she was too fat to be in team pictures and was taken off the schedule for 30 days as "fat probation." (2nd

Am. Complt. ¶ 166). Women, unlike men, were not allowed to eat during their shifts. Women could order only from the "spa menu," which consisted of grilled chicken breasts and steamed vegetables. If women wanted to order from the regular menu, they were required to pay full price for their meals, while men were given free or discounted meals.

Plaintiffs make additional allegations about specific Twin Peaks restaurant locations. Plaintiffs allege that defendant Twin Restaurant Oakbrook, LLC is the employer for plaintiffs who worked at the Twin Peaks restaurant at Oakbrook Terrace. Plaintiffs allege that the women working at this location faced a hostile environment and that they were subjected to catcalls, whistles and sexual jokes.

Plaintiffs allege that defendant Twin Restaurant Orland Park, LLC is the employer for employees who worked at the Twin Peaks restaurant in Orland Park. They allege that the plaintiffs at that location faced a hostile environment the entire time they worked there. Plaintiffs allege they were degraded and demeaned and that kitchen staff harassed them with cat calls, whistles and sexual jokes. Plaintiffs allege that women, unlike men, were forced to work in lingerie and bikinis and that they were penalized financially for not wearing sufficiently skimpy outfits. The Orland Park location provided a "Glam Room" where the women could change, but the Glam Room lacked a door, which meant kitchen staff could (and did) stand at the door and watch while the women changed. Plaintiffs allege defendants allowed the kitchen staff to sexually harass them openly and regularly by whistling at them, propositioning them, touching them and commenting on their clothes and bodies.

Plaintiffs allege that defendant Twin Restaurant Wheeling, LLC is the employer of employees who worked at the Twin Peaks restaurant in Wheeling. Plaintiffs allege that, at this location, too, women were subjected to a hostile environment where women were demeaned and

degraded, where kitchen staff made sexual comments to the women, where women (but not men) were required to wear skimpy outfits, where managers commented on female servers' weight and where managers penalized women financially for not wearing sufficiently skimpy outfits. Plaintiffs make similar allegations about sexual harassment at Twin Peaks locations in Plano, Texas and Round Rock, Texas.

The second amended complaint contains specific allegations as to every plaintiff. With respect to plaintiff Blaylock, who worked at the Orland Park location, for example, plaintiffs allege:

> 121.    Twin Peaks customers regularly sexually harassed Blaylock, ranging from lewd comments to propositions for sex to unwanted touching. As just one example, one customer said to her: "Come rub your pussy on my food." Management knew about it, and sometimes witnessed it, but did nothing about it. When Blaylock complained she was brushed off. Just as when she complained about the kitchen staff, Twin Peaks told her if she didn't like it she could leave. Management even required she take pictures with customers.

> 122.    Management contributed to the hostile work environment. Tony Gutierez required she send him pictures of herself in lingerie. He made it know[n] that Girls who wanted better shifts or tone grades needed to sleep with him. Managers Alex Ramirez and Alex Zepada pressured her to date them. Managers also commented on her, and other Girls', bodies and weight. Twin Peaks monitored what she ate or denied her breaks to eat outright.

> 123.    Management required Blaylock to wear lingerie or otherwise not work. At one point, police issued a warning about servers wearing lingerie. Twin Peaks told the Girls that there was nothing illegal and required her to continue wearing it. When Orland Park Police returned, this time they raided the restaurant, that was packed with men there for a UFC fight night, and ticketed her for indecent exposure, despite the fact that she was wearing shorts under the lingerie to cover her buttocks. Twin Peaks claimed they were handling the ticket but it turned out a Twin Peaks attorney quietly pled her liable and paid the fine rather than defend her.

> 124.    Twin Peaks retaliated against Blaylock for complaining about sexual harassment and objecting to dress-ups, including but not limited to sending her home to change into buttocks-revealing panties, reducing her tone grade, cutting her shifts early, and scheduling her for morning shifts. When she

questioned Twin Peaks' retaliatory practices, they refused to give her an explanation.

(2nd. Am. Complt. ¶¶ 121-124).

Although the plaintiffs, in the second amended complaint, include similar allegations as to each plaintiff, it is not necessary to recount all of the allegations here. The Court will discuss them as necessary below. Still, a few more representative allegations are useful. Plaintiff Anderson, who worked at the Oakbrook Terrace location, was subjected to unwanted touching and comments, including her manager's telling her that her "boobs look small today." (2nd. Am. Complt. ¶ 44). After Anderson complained to "corporate" about sexual harassment, the same manager called her a "fucking bitch," demoted her from bartender to server and refused to transfer her to another location. (2nd. Am. Complt. ¶ 46). When Anderson applied at a Twin Peaks location in Warrenville, Illinois, she was told "corporate placed her on a 'Do Not Hire' list." (2nd. Am. Complt. ¶ 47). Plaintiff Litavsky alleges she was ordered by management onto a party bus, where male customers threw money at her, demanded she dance on a stripper pole and offered her money for sexual favors. She alleges her manager touched her body, commented on her weight and required her to fraternize with "corporate managers" while wearing a bikini. (2nd. Am. Complt. ¶ 69). Plaintiff Quinn, who worked at the Oakbrook location, had a manager tell her that she looked like his fantasy and that he watched her undress through the camera in the Glam Room. After Quinn filed a charge of discrimination, she was hired at another Twin Peaks location only to be fired because she was on the "do not hire" list. Plaintiff Mercer, who worked at the Orland Park location, was subjected to unwanted touching and comments (such as, "Do you like your asshole licked?") by customers, sometimes in front of managers, who did nothing. (2nd Am. Complt. ¶ 133). Managers told Mercer that she needed to reveal more of her body. She was told that if she wanted to improve her tone grade in order to get more lucrative sections,

she needed to sleep with manager Tony Gutierrez, who called her fat until she cried. After Mercer complained to Brad Hager in corporate, Gutierrez yelled at her for telling on him and placed her in the least lucrative section. Plaintiff Rodriguez, who worked at the Orland Park location, was subjected to harassment by customers and managers, one of which managers told her, "You have to treat these women like the hoes that they are." (2nd Am. Complt. ¶ 150).

In addition to sexual harassment and retaliation, some plaintiffs complain about other forms of discrimination, including disability discrimination, as well. Plaintiff Clements, who worked at the Oakbrook location, requested a reasonable accommodation for her alleged disability, lupus. Instead of providing a reasonable accommodation, the company removed her from the schedule. Plaintiff Litavsky alleges she was refused reasonable accommodations for her rheumatoid arthritis, ADD/ADHD and anxiety. Litavsky also alleges that she was harassed on the basis of her disability and that she was subjected to disparate treatment (including removal from shifts and assignment to less lucrative shifts) due to her disability. Plaintiff McBride, who worked at the Twin Peaks location in Plano, Texas, alleges she faced disparate treatment (including lower tone grades, which impacted her financially) on the basis of her alleged disability, Nail-Patella Syndrome, and that she was denied a reasonable accommodation.

Some plaintiffs also allege race discrimination. Plaintiff Farr, who is African American, alleges that she was harassed on the basis of her race and that she was treated less favorably than non-black servers. Plaintiff Moore, who is African American, alleges she was rejected for a bartending position, for which a less-qualified white woman was chosen. Plaintiff Evans, who is African American, alleges that she was harassed on the basis of her race. She alleges that, at a meeting, a corporate executive pointed out her hair and said it was not consistent with Twin Peaks standards. Because her hair was not straight enough, Evans was sent home and forced to

pay for keratin treatments. Plaintiff Winfield, who is African American, was a manager at corporate-owned Twin Peaks locations in Illinois. She alleges that she received smaller bonuses than did male and non-black managers. She was also denied a promotion to general manager.

Plaintiff Frank, who worked at the Oakbrook location, asserts a claim for pregnancy discrimination. Frank alleges that after she became pregnant, she was not allowed to work in the lucrative sections where she had previously worked. After she filed a charge of discrimination, defendants refused to rehire her at the Warrenville location. A manager at Warrenville told her he needed to "confirm with corporate that she was eligible for rehire" and then "said something to the effect of: 'You filed an EEOC charge against us? I don't know if they will hire you back because you are a liability.'" (2nd. Am. Complt. ¶ 66).

Not every plaintiff is a female who worked as a Twin Peaks Girl. Plaintiff Biggers worked as a busser and janitor at the Orland Park location. He alleges that once management learned he is gay, they stopped training him as a trainer and began harassing him by calling him princess and asking him if he wanted to wear the Girls' uniform. After Biggers was called a "cock sucking faggot," Biggers complained to Brad Hagar, who did not respond. (2nd Am. Complt. ¶ 152). Plaintiff Williamson was a manager-in-training at a corporate-owned Twin Peaks location in Texas. Williamson, who had previously managed other restaurants, including a Hooters location, was surprised to see: (a) women forced to wear lingerie; (b) kitchen staff harassing women and watching them change clothes in the doorless dressing room; (c) a general manager watch women change clothes via a camera in the changing room; and (d) a general manager stop him from throwing out a customer who had harassed a female employee. Williamson told senior executives what he had seen and was fired the next day. He alleges that his employment was terminated in retaliation for his having engaged in protected conduct and

that the reason given for his discharge (his being 15 minutes late due to a car accident) was pretext for retaliation.

Plaintiffs have alleged that every plaintiff "has exhausted her administrative remedies and/or such exhaustion would be futile." (2nd. Am. Complt. ¶¶ 41, 48, 53, 58, 63, 67, 75, 81, 85, 90, 94, 99, 105, 109, 112, 120, 125, 129, 132, 137, 141, 147, 151, 157, 161, 165, 168, 173, 182, 191, 198, 203).

Not every plaintiff was employed by the same entity. Defendant Twin Restaurant Warrenville, LLC fired Winfield and refused to hire Frank. Plaintiff Williamson was employed by defendant Twin Restaurant, LLC. Defendant Twin Restaurant Frisco, LLC employed plaintiff Santellanes. Defendant TP Franchise Ventures I, LLP employed Peck. Defendant Twin Restaurants Holding, LP employed McBride. Twin Restaurant, LLC is the listed employer on W-2s issued to plaintiffs Blaylock and Biggers, but Blaylock worked at a location owned by Twin Restaurant Orland Park, LLC.

Plaintiffs allege that the terms and conditions of their employment were jointly controlled by "corporate," and they believe corporate is defendant Front Burner. They allege that Brad Hager, "a key corporate player," was employed by Front Burner. Plaintiffs allege that Front Burner employees are listed on a "who to call" sheet given to managers and that Front Burner is the entity listed on the health insurance plans.

## II.    STANDARD ON A MOTION TO DISMISS

The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon

which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint need not provide detailed factual allegations, but mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice.  *Twombly*, 550 U.S. at 555.  To survive a motion to dismiss, a claim must be plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Allegations that are as consistent with lawful conduct as they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570. In considering a motion to dismiss, the Court accepts as true the factual allegations in the complaint and draws permissible inferences in favor of the plaintiff.  *Boucher v. Finance Syst. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018).

## III.    DISCUSSION

### A.    Twin Peaks defendants' motion to dismiss

Twelve defendants, Twin Restaurants Oakbrook, LLC, Twin Restaurant Orland Park, LLC, Twin Restaurant Wheeling, LLC, Twin Restaurant Warrenville, LLC, Twin Restaurant Holding, LLC, Twin Restaurant, LLC, Twin Restaurant Franchise, LLC, Twin Restaurant Investment Co. II, LLC, Twin Restaurant Investment Company, Twin Restaurant Frisco, LLC, TP Franchise Ventures I, LLC and Twin Restaurant IP LLC, which collectively refer to themselves as the "Twin Peaks defendants," have filed a motion to dismiss plaintiffs' complaint.[1]

---

[11] In their response, plaintiffs say they are willing to dismiss Twin Restaurant IP LLC.  (Plf. Brief at 27 n. 17/Docket 51 at 34).  They should file a notice of voluntary dismissal pursuant to Rule 41 of the Federal Rules of Civil Procedure.

1. **Failure to state a claim**

Defendants argue that many plaintiffs have failed to include sufficient facts to make their claims of discrimination and harassment plausible. This portion of the motion is not well taken.

Plaintiffs' claims arise under Title VII, the Pregnancy Discrimination Act and the American with Disabilities Act ("ADA"). Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin." 42 U.S.C. § 2000e-2(a). Under the Pregnancy Discrimination Act, "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work[.]" 42 U.S.C. § 2000e(k). The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Included in the definition of "discriminate" under the ADA is "not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).

Defendants seem to believe: (a) that plaintiffs must include enough facts in a complaint to establish a prima-facie case of discrimination in order to state a claim for disparate treatment;

and (b) that plaintiffs must set out facts that would constitute severe and pervasive conduct in order to state a claim for harassment under the various employment discrimination statutes. The Court disagrees, and defendants' arguments fly in the face of binding Seventh Circuit precedent. Federal courts do not require fact pleading. All that is required is enough to put defendants on notice of a plaintiff's claim.

Discrimination claims are the easiest to state and require the least elaboration. The standard is "undemanding." *Tate v. SCR Medical Transp.*, 809 F.3d 343, 346 (7th Cir. 2015). "Employers are familiar with discrimination claims and know how to investigate them, so little information is required to put the employer on notice of [plaintiff's] claims." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014).

Although it is not enough for a plaintiff to allege a legal conclusion, such as "defendant violated Title VII," a plaintiff need allege only a few facts. To survive a 12(b)(6) motion, a complaint alleging disparate treatment "need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis" of a specified protected class. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008); *see also Freeman v. Metropolitan Water Reclamation Dist. of Greater Chi.*, 927 F.3d 961, 965 (7th Cir. 2019) ("to proceed against [defendant] under . . . Title VII, [plaintiff] needed only to allege—as he did here—that [defendant] fired him because of his race"). The same is true for claims of retaliation. *Tamayo*, 526 F.3d at 1085.

Harassment claims are similarly easy to state. Like other claims of discrimination, a plaintiff can state a claim for harassment with very few facts. *See Tate*, 809 F.3d at 346. In *Tate*, the Seventh Circuit reversed the dismissal—for failure to state a claim—of a complaint in which the plaintiff alleged merely, "[d]uring my employment, I was subjected to sexual

harassment.  I complained to no avail."  *Tate*, 809 F.3d at 345-346.  The Seventh Circuit said the sexual harassment claim was "adequately alleged," because "to prevent dismissal under Rule 12(b)(6), a complaint alleging sex discrimination need only aver that the employer [had] instituted a (specified) adverse employment action against the plaintiff on the basis of her [or his] sex.'"  *Tate*, 809 F.3d at 346 (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084-85 (7th Cir. 2008)).

In their brief, defendants argue that plaintiffs Evans, Frank, Mascorro, Miranda, Sullivan and Ward fail to include sufficient allegations of sexual harassment, because they allege merely that they were "sexually harassed."  (Def. Brief at 16-17/Docket 42 at 25-26).  The very allegations defendants quote suffice under *Tate*.  For the same reason, the Court rejects defendants' argument that Winfield, Moore, Farr and Evans failed to state a claim for racial harassment and defendants' argument that Clements and McBride failed to state a claim for disability harassment.  Plaintiffs have given defendants sufficient notice of their harassment claims.

Defendants also argue that certain plaintiffs failed to state claims for disparate treatment under particular statutes.  For example, defendants argue that Clements, McBride and Litavsky failed to state claims under the Americans with Disabilities Act.  The Court disagrees.  Each identified an alleged disability.  All three alleged they were denied reasonable accommodations.  Denial of a reasonable accommodation constitutes unlawful discrimination under the ADA.  42 U.S.C. § 12112(b)(5)(A).  Each also alleges she has faced disparate treatment due to her alleged disability:  Clements alleges she was removed from the schedule; Litavsky alleges she was removed from shifts and assigned to less lucrative shifts; and McBride alleges she was given lower tone grades, which impacted her financially.  These are sufficient allegations of an adverse

employment action. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014) (reassignment to less lucrative section was adverse employment action); 42 U.S.C. § 12112(a) (unlawful to "discriminate against a qualified individual on the basis of disability in regard to . . . employee compensation").

Defendants also argue that plaintiff Frank failed to state a claim for pregnancy discrimination, but the Court disagrees. Frank alleges she was forced to work in less lucrative sections due to her pregnancy. That is enough to state a claim.

Next, with respect to plaintiffs' claims of disparate treatment on the basis of sex in violation of Title VII, defendants argue that 26 plaintiffs failed to identify adverse actions. Specifically, defendants argue that Anderson, Bidochka, Blaylock, Clements, Faynshteyn, Farr, Litavsky, Marrotta, McBride, Mercer, Moore, Peck, Quinn, Reed, Rodriguez, Santellanes, Subsits, Uphoff, Villega, Evans, Frank, Mascorro, Miranda, Sullivan, Ward and Winfield all failed to allege adverse actions. The Court disagrees. Plaintiffs allege that they, unlike male employees, were required, during certain weeks, to purchase and wear lingerie (which could not be worn more than once) lest they be removed from the schedule. In addition, plaintiffs allege that they, unlike male employees, were judged on their physical appearance and given less lucrative assignments based on the results. Depending on the financial consequences, such conduct could constitute adverse actions under Title VII. *See Alexander*, 739 F.3d at 980. Furthermore, Winfield has alleged disparate treatment on the basis of her sex by alleging, among other things, that she was denied raises and given smaller bonuses, relative to men and that she was denied a promotion. (2nd Am. Complt. ¶ 177).

Finally, defendants argue that certain plaintiffs have failed to state a claim for retaliation. The Court, again, disagrees. For most plaintiffs, defendants object that they fail to include

sufficient details of how, when and to whom they complained. Plaintiffs are not, however, alleging fraud, so Rule 9(b)'s requirement of particularly does not apply. It is true that plaintiffs cannot merely allege legal conclusions, such as, "I engaged in protected activity," but these plaintiffs do not allege such conclusions. They allege actual facts (for example, that they "complained" about "sexual harassment"), and additional details are not required to give defendants notice of their claims.

Defendants argue that a few, specific plaintiffs have failed to include enough allegations to make out a retaliation claim. Defendants argue that Biggers has not included sufficient allegations of an adverse action. The Court disagrees. Biggers alleges defendants canceled his last paycheck. (2nd Am. Complt. ¶ 153). Defendants argue that Winfield fails to state a claim for retaliation, but she alleges she was suspended and then fired after stating publicly that she intended to treat all employees equally. That is enough to put defendants on notice of her retaliation claim. Finally, defendants argue that Ward, Reed, Fuller and Temesvary fail to include sufficient allegations of retaliation, but, as plaintiffs point out, these four plaintiffs did not attempt to state claims for retaliation (*see* 2nd Am. Complt. ¶ 241), so there is nothing to dismiss.

Plaintiffs have put defendants on notice of their claims. The motion to dismiss for failure to state a claim is denied.

### 2. Affirmative defenses

The Twin Peaks defendants next argue that Counts I, II and VI should be dismissed for failure to file within 90 days of receiving a notice of right to sue. They also argue that Counts I, II, IV, V and VI should be dismissed for failure to exhaust administrative remedies. Defendants' arguments, to which they have dedicated ten pages of their oversized brief, are not well taken.

As plaintiffs point out, failure to comply with a statute of limitations is an affirmative defense, as is failure to exhaust administrative remedies. *See Stuart v. Local 727, Int'l Bhd. of Teamsters*, 771 F.3d 1014, 1017 & 18 (7th Cir. 2014); *Salas v. Wisc. Dep't. of Corrections*, 493 F.3d 913, 921 & 922 (7th Cir. 2007). Plaintiffs need not plead around an affirmative defense, and the Court may not dismiss a claim on the basis of an affirmative defense unless plaintiffs allege, and thus admit, the elements of the affirmative defense. *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir. 2014); *United States Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 626 (7th Cir. 2003).

These plaintiffs have not alleged, and thus admitted, the ingredients of defendants' statute-of-limitations affirmative defense. Individuals seeking relief under Title VII must file suit within 90 days of receiving a notice of right to sue from the Equal Employment Opportunity Commission ("EEOC"). 42 U.S.C. § 2000e-5(f)(1). The 90-day period "begins to run on the date that the EEOC right-to-sue notice is actually received *either by the claimant or by the attorney representing him in the Title VII action.*" *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 850 (2001) (emphasis in original) (quoting *Jones v. Madison Service Corp.*, 744 F.2d 1309, 1312 (7th Cir. 1984)). The Seventh Circuit has also held that the "actual notice rule does not apply to plaintiffs who fail to receive actual notice through their own fault," such as by failing to alert the EEOC to a change of address. *Houston v. Sidley & Austin*, 185 F.3d 837, 839 (7th Cir. 1999). These plaintiffs have not included in their second amended complaint any allegations as to the date they or their attorney received their respective notices of right to sue. Thus, plaintiffs have not alleged, and thus admitted, the ingredients of defendants' affirmative defense. Plaintiffs have not pleaded themselves out of court with respect to the statute of limitations, and the Court will not grant the motion to dismiss on that basis.

Next, defendants argue that some plaintiffs have failed to exhaust their administrative remedies. Defendants argue that some plaintiffs include allegations in the second amended complaint that are beyond the scope of their charges of discrimination. Defendants argue that certain plaintiffs filed no charges of discrimination or that a charge of discrimination was untimely. Defendants support these arguments by attaching an attorney's declaration and copies of charges of discrimination. The Court, however, cannot consider this information on a motion to dismiss. On a motion to dismiss under Rule 12(b)(6), a court may not consider "matters outside the pleadings" without converting the motion to one for summary judgment. Fed.R.Civ.P. 12(d). The pleadings include the complaint and answer (Fed.R.Civ.P. 7(a)), as well as attachments thereto (Fed.R.Civ.P. 10(c)). Plaintiffs have not alleged, and thus admitted, the elements of defendants' exhaustion affirmative defense.

Defendants may (or may not) have good arguments on these points at a subsequent stage of the litigation, but the Court will not grant a motion to dismiss based on defendants' affirmative defenses.

### 3. Arbitration

Finally, the Twin Peaks defendants move under Rule 12(b)(3) to dismiss the claims of plaintiff Santellanes. They argue that venue is improper owing to the fact that Santellanes signed an arbitration agreement. In effect, defendants' motion is one to compel arbitration. *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 890 (7th Cir. 2020) ("Though [defendant's] motion bore a Rule 12(b)(3) sticker, the venue argument was rooted in enforcement of the arbitration agreement.").

"The Federal Arbitration Act requires courts to enforce covered arbitration agreements according to their terms." *Lamps Plus, Inc. v. Varela*, __ U.S. __, 139 S.Ct. 1407, 1412 (2019)

(citing 9 U.S.C. § 2). It "was originally enacted, 'to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts.'" *Kawasaki Heavy Industries, Ltd. v. Bombardier Recreational Products, Inc.*, 660 F.3d 988, 994 (7th Cir. 2011). To compel arbitration, "a party need only show: (1) an agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal by the opposing party to proceed to arbitration." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 466 F.3d 577, 580 (7th Cir. 2006). The burden is on the party seeking to compel arbitration to show arbitration is the appropriate venue. *See A.D. v. Credit One Bank, NA*, 885 F.3d 1054, 1063 (7th Cir. 2018). Issues of the validity and scope of an arbitration agreement are decided under state law. *Gupta v. Morgan Stanley Smith Barney*, 934 F.3d 705, 710-11 (7th Cir. 2019).

This Court's discussion of arbitration law is already much longer than the argument defendants make in their motion to dismiss, and they come dangerously close to waiving the entire issue for insufficient development. *See Spath v. Hayes Wheels International-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) ("[i]t is not [a] court's responsibility to research and construct the parties' arguments") (citations omitted). Their argument applying arbitration law to this case is less than five lines long. They have waived any arguments not made in their opening brief on this issue.

Defendants have attached to their motion a copy of the arbitration agreement signed by Santellanes, and they cite sections 1 and 2 in support of their argument that Santellanes's claims are within the scope of the agreement. (Defs. Brief at 13/Docket 42 at 22). Those portions of the arbitration agreement, which Santellanes signed on May 10, 2019, state, in relevant part:

> 1. Any controversy, dispute or claim arising out of or relating to your employment with the Company . . . shall be settled by final and binding

arbitration administered by the American Arbitration Association (the "AAA") in accordance with its Employment Arbitration Rules . . .

       2.     Such arbitration shall be held in the city where the employee primarily worked, unless the parties agree on a different venue, or if otherwise required by applicable law.

(Docket 42-2 at 4). The Court agrees that the claims brought by Santellanes, who seeks relief under Title VII for sexual harassment and retaliation, arise from her employment and, therefore, are within the scope of the agreement.

Defendants, however, do not bother to explain why the arbitration agreement is enforceable under Texas law or why any of the Twin Peaks defendants who filed the motion to dismiss is entitled to enforce the agreement.[2] Accordingly, the Court finds that defendants have not met their burden of showing that Santellanes must arbitrate her claims. Their motion to dismiss under Rule 12(b)(3) is denied.

### B.      Front Burner's motion to dismiss—joint employer

Defendant Front Burner moves to dismiss plaintiffs' complaint on the grounds that plaintiff has not sufficiently alleged that it was plaintiffs' employer. As Front Burner points out, only an employer is liable under the statutes under which plaintiffs seek relief. Plaintiffs, accordingly, are attempting to allege that Front Burner is liable to plaintiffs as a joint employer. *See Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 928-29 (7th Cir. 2017).

In *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697 (7th Cir. 2015), the Seventh Circuit explained that in considering whether a defendant is a joint employer, it would consider: (a) the five factors (the "*Knight* factors") set out in *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991) to determine how much control the asserted joint employer

---

[2] Arguments made for the first time in a reply brief are waived. *Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010).

exercised over the plaintiff; and (b) "the economic realities of the relationship." *Love*, 779 F.3d at 702. The *Knight* factors are: (1) "the extent to which the putative employer controlled or supervised the alleged employee;" (2) "the type of occupation and the nature of the skills required for the position in question;" (3) "whether the putative employer was responsible for the costs of 'equipment, supplies, fees, licenses, workplace, and maintenance of operations;'" (4) "whether the putative employer was responsible for providing payment and benefits;" and (5) "the length of the employee's job commitment and/or the expectations of the parties." *Love*, 779 F.3d at 702-05.

Front Burner argues that plaintiffs have not alleged plausibly that it is a joint employer, but the Court disagrees. Plaintiffs have put Front Burner on sufficient notice of their joint-employer theory. First, plaintiffs have included allegations that suggest Front Burner had control. Plaintiffs have alleged that all new hires were approved by corporate and that corporate could veto rehires. *See Love*, 779 F.3d at 703 ("when control is examined, 'the key powers are, naturally, those of hiring and firing.'") (quoting *EEOC v. Illinois*, 69 F.3d 167, 171 (7th Cir. 1995)). Plaintiffs have also alleged that they believe Front Burner is corporate. Plaintiffs have further alleged that Brad Hager, "a key corporate player," was employed by Front Burner. Plaintiffs allege that Front Burner employees are listed on a "who to call" sheet given to managers. In addition, plaintiffs, by alleging that Front Burner is the entity listed on the health insurance plan, have alleged that Front Burner was involved in benefits.

Plaintiffs have plausibly alleged that Front Burner was their joint employer, so the Court will not dismiss the claims against Front Burner on that basis. *See Hampton v. Democratic Party of Ill.*, Case No. 18 C 2069, 2018 WL 5619421 at *2 (N.D. Ill. Oct. 30, 2018) ("courts typically will not resolve the question of whether an employment relationship exists at the pleading stage

because it requires a fact intensive inquiry"); *Thomas v. Coach Outlet Store*, Case No. 16 C 3950, 2017 WL 386656 at *3 (N.D. Ill. Jan. 27, 2017) ("The issue of whether an entity is a joint employer is generally unsuitable for resolution on the pleadings because it involves 'a fact-intensive inquiry that typically requires further development through discovery.'") (internal citation omitted).

To the extent Front Burner is arguing that plaintiffs' claims should be dismissed for failure to state a claim or for failure to exhaust administrative remedies, such arguments are rejected for the same reasons outlined above.

Front Burner's motion to dismiss is denied.

## IV.    CONCLUSION

For the reasons set forth above, the Court denies Front Burner's motion [44] to dismiss. The Twin Peaks defendants' motion [41] to dismiss is denied.  Defendants' answers are due August 9, 2021.  This case is set for status hearing on August 27, 2021 at 9:30 a.m.  The parties shall file a status report by August 18, 2021.

SO ORDERED.                                  ENTERED:   July 15, 2021

_____
JORGE L. ALONSO
United States District Judge